Filed 6/18/14  P. v. Orosco CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F065644 |
| Plaintiff and Respondent, | (Super. Ct. No. CRM018092) |
| v. | |
| JOSE MERWIN OROSCO, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Merced County.  Marc A. Garcia, Judge.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE DISSENTING OPINION**

Defendant Jose Merwin Orosco pled no contest to one count of possession of a firearm by a felon (former Pen. Code,[1] § 12021, subd. (a)(1), now § 29800, subd. (a)(1)) and admitted an allegation that he had previously suffered a prior serious or violent felony conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(i)). Defendant entered this plea after the trial court denied his motion to quash a search warrant. Pursuant to a plea agreement, defendant was sentenced to a term of two years eight months in state prison.

On appeal, defendant argues the trial court erred in denying his motion to quash the search warrant.

## FACTUAL AND PROCEDURAL HISTORY

Police officer Michael Baker obtained a warrant to search several properties associated with a multiagency law enforcement investigation into the distribution and sales of narcotics for the benefit of the Nuestra Familia prison gang and affiliated Norteño criminal street gangs. The 100-page affidavit in support of a warrant detailed the activities of several persons and covered an extensive investigation into suspected narcotics trafficking. One of the properties included in the warrant was a residence in Livingston where defendant resided. The search of defendant's home resulted in his arrest for unlawful possession of a firearm and ammunition.

Defendant moved to quash the search warrant and suppress the evidence pursuant to section 1538.5 on the grounds that: (1) the affidavit in support of the search warrant failed to establish a nexus between defendant's home and criminal activity and thus could not support a finding of probable cause, and (2) the information contained in the affidavit was too stale to establish probable cause. The trial court denied the motion, and defendant subsequently entered a plea. On appeal, defendant once again asserts the information contained in the affidavit failed to draw a nexus between criminal activity and his home and that the information was impermissibly stale.

---

[1]All further references are to the Penal Code unless otherwise specified.

2.

*Relevant details of the affidavit*

At the time the warrant was issued, Officer Baker had been a member of the Livingston Police Department for seven years and was assigned to the Merced Multi-Agency Gang Task Force. Baker's task force duties included documenting and registering gang members and tracking gang-related crime throughout Merced County. Before his task force assignment, Baker was the Livingston Police Department's gang officer, where his primary duties included investigating and tracking gang activity in the Livingston area; this included the investigation of over 200 gang-related crimes and interviews of over 300 gang members, informants, and witnesses.

The affidavit explained the Nuestra Familia prison gang exerts control over all affiliated Norteño street gangs in Northern California, and high-ranking Nuestra Familia members direct the sales and distribution of narcotics by handing down orders to lower ranking members who, in turn, enlist the use of affiliated Norteño criminal street gang members. During the investigation, task force agents identified several high-ranking street gang members with Nuestra Familia status, including Efren Garibay-Muniz, who Baker attests was "running" the Livingston/Merced County area. Wiretap surveillance of Garibay-Muniz's phone allowed agents to identify other Nuestra Familia members and high-ranking gang associates, including, among others, Adan Singh and Augustine Singh.[2]

Next, the affidavit detailed several phone conversations between Garibay-Muniz and other individuals in which Garibay-Muniz sought to acquire a large quantity of methamphetamine for resale. These phone conversations and other agent-observed activities led police to conclude that Garibay-Muniz acquired the narcotics he sought on May 10, 2011.[3]

---

[2]To avoid confusion, we will refer to the two men by their first names. No disrespect is intended.

[3]All further references to dates are to 2011 unless otherwise indicated.

It appears from the affidavit that Augustine was involved in the procurement of the narcotics. Augustine called Garibay-Muniz on May 10, telling Garibay-Muniz he had a "present" for him. Garibay-Muniz replied he would come over. Based on the actions observed by the officers after the call, Baker opined that another individual supplied Augustine and Garibay-Muniz with narcotics to be sold at the direction of the Nuestra Familia and Norteño gangs.

The following day, agents intercepted another call between Augustine and Garibay-Muniz, where Augustine noted the narcotics were good quality and he had paid more, but the quality was high. Garibay-Muniz stated he was going to pick it up that night. Additional communications between the two suggested the narcotics were to be delivered promptly.

Agents also observed approximately 10 Hispanic males enter Garibay-Muniz's apartment and intercepted additional communications indicating the presence of narcotics. Based on the communications and observed actions, officers suspected "Garibay-Muniz was supplying other [Norteño] criminal street gang members with the narcotic he had previously obtained." Agents further believed the men at Garibay-Muniz's home were "street level dealers that work under the direction of Garibay-Muniz a N[uestra] F[amilia] leader in the Merced and Livingston areas."

On May 12 at approximately 8:07 p.m., agents intercepted an incoming call from Adan to Garibay-Muniz. Adan told Garibay-Muniz, "'we want to get together, you want to do it today or you want to do it another day?'" Garibay-Muniz responded, "'whatever.'" Adan asked once again, "'you think we should just do it today and get it over with,'" to which Garibay-Muniz responded "'yes.'" Adan then indicated he would have David Reos pick them up.

At approximately 8:15 p.m., Adan called Garibay-Muniz once again to ask him "to be out in front of the apartment complex, so they don't have to drive all the way inside …." While officers were on their way to Garibay-Muniz's home, his cellular telephone was pinged and it showed him at the intersection of Hickory Avenue and East

4.

Avenue in Livingston. At the motion hearing, the trial court described this location as "more toward" the search warrant address. At about the same time, Baker noticed Reos's vehicle parked in front of defendant's home. Baker stated defendant is a Nuestra Familia member and a high-ranking member in the "Livas" Norteño gang, one of Livingston's Norteño street gangs. Baker further stated he previously made personal contact with defendant at the search warrant address.

Subsequently, agents set up surveillance at defendant's home. At 8:37 p.m. agents intercepted a call from Garibay-Muniz to Singh.[4] The call went unanswered; however, agents overheard a male voice in the background saying "'get that money,'" and "'words where an individual takes that responsibility and imposes it on the whole group, it's that individual's responsibility to get that money.'" Garibay-Muniz responded, "'Because it's his responsibility so just leave him by himself.'" Based on his training and expertise, Baker believed the male in the background was reading off Nuestra Familia commands and educating other gang members on their policies and conducting a meeting furthering the gang's criminal activities.

At 9:30 p.m., Livingston police conducted a traffic stop of Reos's vehicle and discovered Reos along with both Garibay-Muniz and Adan inside. Six minutes later, the vehicle was released with no action taken. Task force agents then followed the vehicle and observed Garibay-Muniz and Adan being dropped off at their respective residences.

Baker concluded that based on the above information and his knowledge of the "Livas" Norteño criminal street gang, he believed defendant conducted a gang meeting at his home with other gang members in order to further the sales and distribution of narcotics. Defendant is not mentioned before or after in the affidavit, nor is there any additional reference to the gang meeting allegedly held in his home.

---

[4]It is unclear from the affidavit if this call was made to Adan or Augustine Singh.

## DISCUSSION

### The Affidavit Failed to Establish Probable Cause

Defendant contends the affidavit in support of the warrant failed to establish probable cause for the search of his home. He argues the affidavit failed to establish a sufficient nexus between his home and criminal activity. We agree.

### *Legal Standards*

The "standard of probable cause is whether the affidavit states facts that make it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought." (*People v. Cook* (1978) 22 Cal.3d 67, 84, fn. 6.) "In determining whether an affidavit is supported by probable cause, the magistrate must make a 'practical, common-sense decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place.' (*Illinois v. Gates* [(1983)] 462 U.S. [213,] 238.)" (*Fenwick & West v. Superior Court* (1996) 43 Cal.App.4th 1272, 1278.) "The affidavit must establish a nexus between the criminal activities and the place to be searched. [Citation.] 'The opinions of an experienced officer may legitimately be considered by the magistrate in making the probable cause determination.' [Citation.] However, an affidavit based on mere suspicion or belief, or stating a conclusion with no supporting facts, is wholly insufficient. [Citation.]" (*People v. Garcia* (2003) 111 Cal.App.4th 715, 721.) On appeal, we consider "whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." (*People v. Kraft* (2000) 23 Cal.4th 978, 1040.)

"On review, the search warrant affidavit is construed in a commonsense and realistic fashion" (*People v. Hernandez* (1994) 30 Cal.App.4th 919, 923 (*Hernandez*)), and its sufficiency must be judged on the totality of the circumstances contained therein (*People v. Andrino* (1989) 210 Cal.App.3d 1395, 1401). Where, as here, the affidavit is the only evidence presented to the issuing magistrate, the warrant must stand or fall on the contents of the affidavit. (*United States v. Sherwin* (9th Cir.

1977) 572 F.2d 196, 198, cert. den. *sub nom. Sherwin v. United States* (1978) 437 U.S. 909.)  The Fourth Amendment does not prohibit the use of reasonable inferences drawn from evidence; it simply requires that such inferences be drawn by a neutral and detached magistrate.  (*United States v. Ventresca* (1965) 380 U.S. 102, 106.)  There is a strong preference for warrants, and a doubtful or marginal case must be resolved in favor of the warrant.  (*Ibid.*)

*Analysis*

The affidavit established that Garibay-Muniz coordinated and ultimately acquired a large quantity of narcotics for resale.  Additionally, the affidavit supports the conclusion Garibay-Muniz is a high-ranking Nuestra Familia gang member.  Specifically, the affidavit recites Garibay-Muniz's criminal history, which included a conviction for possession of a weapon while an active member of a criminal street gang (former § 12031, subd. (a)(2)(C)), his association with other documented Norteño gang members, his tattoos that are indicative of gang membership, and his self-admission of Norteño gang membership.  Additionally, the affidavit recounts Garibay-Muniz's conversations with other gang members and documents his actions which led to Baker's conclusion that Garibay-Muniz is a high-ranking Nuestra Familia leader.

After obtaining the drugs, Adan contacted Garibay -Muniz regarding a meeting.  Reos picked up both Adan and Garibay-Muniz and officers pinged Garibay-Muniz's phone and determined it was in the area of defendant's home.  Shortly thereafter, Baker observed Reos's vehicle parked outside of defendant's home.  After initiating surveillance on defendant's home, officers intercepted a call between Garibay-Muniz and Singh.[5]  Although the call went unanswered, officers heard part of a conversation in the background, which in their experience led them to believe the person speaking was providing Nuestra Familia commands and educating other gang members at defendant's home.  Additionally, Baker opined that "members of the N[uestra] F[amilia] prison gang

---

[5]It is unclear from the affidavit whether the call was placed to Adan or Augustine Singh.

7.

and Livas [Norteño] criminal street gang were conducting a meeting to further criminal activities by the gangs." The affidavit failed to state whether anyone was ever observed either entering or exiting defendant's home.

A short time later, a police officer conducted a traffic stop on Reos's vehicle. Reos, Garibay-Muniz, and Adan were all present inside the vehicle. Baker explained in the affidavit that Adan, like Garibay-Muniz, is a Norteño gang member. Baker provided factual support for this conclusion. He noted Adan's prior convictions, as well as his prior arrests with other documented gang members, including Augustine, who was also involved in the procurement of the narcotics. According to sheriff department records, Adan admitted in a prior booking being an active Norteño gang member and associating with the Livas gang. Furthermore, Baker had information from a confidential informant who stated Adan had "N[uestra] F[amilia] status" allowing him to attend Nuestra Familia meetings and conduct Nuestra Familia business.

Likewise, Baker provided information regarding Augustine's criminal street gang connections. Baker recited Augustine's arrests and convictions, including convictions for participation in a street gang, assault with a deadly weapon, felon in possession of a firearm, and possession of a firearm in a vehicle. He noted Augustine has associated with other gang members and had various tattoos indicative of his association with both the Norteño and Nuestra Familia gangs.

The question presented here is whether the statements contained in the affidavit provide a sufficient nexus between the criminal activity and defendant's home. We conclude they do not. The combination of the narcotics activity, along with the individual's gang status and the observations by the officers all supported the conclusion Garibay-Muniz was holding a gang meeting. The location of that meeting, however, is less clear. The only facts linking the meeting to defendant's home were: (1) Reos's vehicle being parked outside, and (2) defendant's affiliation with the gang.

Baker opined that defendant was a member of the Norteño gang associating with the Livas gang. While Baker was clearly qualified to render that opinion, it must have

8.

some factual basis. (*People v. Garcia*, *supra*, 111 Cal.App.4th at p. 721.) Here, Baker's conclusion was not based on any facts that could be reviewed by the magistrate. While the affidavit specifically states Baker has personal knowledge defendant lived at the specific address, it provided no facts regarding his gang membership.

The sum total of information regarding defendant's gang membership is as follows: "Orosco is a N[uestra] F[amilia] member and a high-ranking 'Livas' [Norteño] street gang member." While this statement is repeated throughout the affidavit, there is nothing in the affidavit that supports the conclusion. Although the "'opinions of an experienced officer may legitimately be considered by the magistrate in making the probable cause determination, … an affidavit based on mere suspicion or belief, or stating a conclusion with no supporting facts, is wholly insufficient." (*People v. Garcia*, *supra*, 111 Cal.App.4th at p. 721.) This deficiency is highlighted by the fact Baker stated the various facts supporting his conclusion that other targets of the search warrant were gang members.

The conclusory nature of the affidavit relating to defendant's gang membership is similar to the situation presented in *Rodriguez v. Superior Court* (1988) 199 Cal.App.3d 1453. There, we had occasion to address the conclusory nature of an affidavit regarding drug sales. The affiant declared that a confidential informant had been present at the residence " '[w]hen heroin has been sold from said residence.'" (*Id*. at p. 1462.) Additional information stated only that the informant was at the residence on other occasions when heroin was sold from the residence, had accompanied others to the residence for the purpose of buying heroin, observed the others enter and exit the residence and display to him a quantity of the drug stating they had purchased the drugs inside. Neither the unnamed individuals nor the informant could identify or describe the person who purportedly sold the drugs. (*Id*. at p. 1463.)

In considering the question of whether the affidavit supplied probable cause to sustain the issuance of a search warrant, we concluded it did not. We found the

9.

"statement that, within two days prior to preparation of the affidavit, a confidential informant was at petitioners' residence when heroin was sold from the residence is nothing more than 'a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause.' (*Illinois v. Gates*, *supra*, 462 U.S. at p. 239.) The statement contained no *facts* that might establish the basis of the confidential informant's knowledge. It does not indicate the informant was in the house; it states only he was *at* the residence. It reflects no facts upon which the informant, and consequently the affiant, could conclude heroin was being sold. No substance was observed or smelled, no bindle or other forms of packaging were noted, no exchange of drugs for money was observed." (*Rodriguez v. Superior Court*, *supra*, 199 Cal.App.3d at p. 1464.)

While we may make reasonable inferences and rely upon an officer's expertise in interpreting the facts, mere conclusory statements do not supply probable cause. (*Illinois v. Gates*, *supra*, 462 U.S. at p. 239.) Here, the only link between defendant and Garibay-Muniz provided in the affidavit is their mutual gang affiliation. However, there are no facts in the affidavit that would allow the magistrate to evaluate Baker's conclusion that defendant is a gang member. In fact, the only assertion in the affidavit supporting defendant's gang affiliation is Baker's statement that defendant is a gang member.

Without the critical link—that defendant is a high-ranking member of the gang controlled by Garibay-Muniz—the affidavit fails to establish a nexus between the criminal activities and defendant's residence. Rather, the situation becomes akin to the situation in *Hernandez*, *supra*, 30 Cal.App.4th 919 relied upon by defendant.

In *Hernandez*, two informants purchased heroin from a narcotics dealer known as Chavelo under police-controlled circumstances. (*Hernandez*, *supra* 30 Cal.App.4th at p. 921.) After the second controlled narcotics transaction and on several occasions thereafter, officers observed Chavelo park a vehicle behind the defendant's residence located at 610 Orange Drive. (*Ibid*.) Based on this information alone, police obtained a warrant to search the 610 Orange Drive residence, where heroin, scales and plastic bags were discovered. (*Id*. at p. 922.) The defendant argued the affidavit in support of the warrant failed to establish a sufficient nexus between Chavelo's heroin sales and his

residence. (*Ibid*.) The court agreed. The court explained the affidavit was silent on whether Chavelo ever entered the defendant's residence or any other structures on the property or whether Chavelo resided in the residence. (*Id*. at pp. 923-924.) The presence of the vehicle raised suspicions, but without additional circumstances, it failed to draw a nexus between the criminal activity and the residence. (*Id*. at p. 924.)

Likewise here, Reos's vehicle parked outside of defendant's residence while officers believed a gang meeting was taking place was not sufficient to support a nexus between the criminal activity and defendant's residence. Nothing in the affidavit established anyone was seen entering or exiting defendant's home. The mere fact of a vehicle parked in front of a home is insufficient to draw a nexus to criminal activity taking place inside. (*Hernandez*, *supra*, 30 Cal.App.4th at p. 924.)

The People argue that even if the warrant was unsupported by probable cause, the officer reasonably relied on the warrant under the good faith exception to the warrant requirement. Under *United States v. Leon* (1984) 468 U.S. 897, 922, a police officer may rely in good faith on a warrant later to be found invalid. However, the exception does not apply where the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' [Citations.]" (*Id*. at p. 923.) In evaluating this question we ask "whether a reasonable and well-trained officer 'would have *known* that his affidavit failed to establish probable cause and that he should not have applied for the warrant.' [Citation.]" (*People v. Camrella* (1991) 54 Cal.3d 592, 605-606.)

Here, other than his conclusory statement, Baker provided no information that defendant was a gang member. Baker provided no information regarding defendant's gang contacts or his association with other gang members, any confidential informant information on defendant's gang membership, any information of defendant's self-identification as a gang member, or any information regarding tattoos indicative of gang membership. It is important to note that in stark contrast to the lack of information provided about defendant, Baker provided significant factual support for his conclusion

11.

other targets of the investigation, such as Garibay-Muniz, Adan, and Augustine were in fact gang members. That such information was provided for other targets of the investigation but not defendant suggests Baker should have realized his conclusion was completely unsupported by any factual basis.

Likewise, the affidavit does not establish anyone was observed either entering or exiting defendant's home during the crucial time period. Although Baker stated officers surveilled defendant's home after spotting Reos's vehicle there, nothing stated Garibay-Muniz, Adan, or any other persons were seen exiting the home. The only information listed in the affidavit linking the meeting to defendant's home was the fact Reos's vehicle was parked in front of defendant's home. Thus the situation was virtually identical to *Hernandez*, which concluded the absence of nexus between the criminal activity and residence sought to be searched was so apparent that no reasonably well-trained officer could have relied on the warrant. (*Hernandez*, *supra*, 30 Cal.App.4th at pp. 924-925.)

The dissent disagrees with this conclusion and instead analogizes this case to *People v. Romero* (1996) 43 Cal.App.4th 440 (*Romero*). There, an undercover officer engaged in a narcotics transaction with Richard Medina. Subsequently, the officer called Medina to purchase additional narcotics. Medina explained he would need to check with his sources and would call the officer back. Additional officers conducted surveillance on the home and observed two men leave the home, travel to a tavern where one man went inside for a few minutes, then returned to their vehicle and traveled to the defendant's mobilehome. Three minutes later, the vehicle left the defendant's home and returned to Medina's home. Shortly thereafter, Medina called the undercover officer and told him he did not have any narcotics at that time. (*Id*. at pp. 443-444.)

A few weeks later, the officer again called Medina and arranged for the purchase of some narcotics. Once again, the home was under surveillance. After the telephone conversation, Medina was followed by officers as he drove directly from his home to the defendant's mobilehome. Two minutes later, Medina drove directly to the prearranged

12.

location of the narcotics sale.  Subsequently, officers obtained a warrant, relying on the above facts, to search the defendant's home.  (*Romero*, *supra¸* 43 Cal.App.4th at p. 444.)

The defendant moved to suppress the evidence recovered in his home, arguing the warrant lacked probable cause.  The trial court found the officers relied in good faith upon the warrant.  On appeal, the Third District Court of Appeal agreed.  Relying on the temporal sequence of events, the court distinguished the case from *Hernandez*.  In *Hernandez*, as explained above, there was no nexus between the defendant's residence and a car parked behind the residence.  However, in *Romero* there was a nexus between the drugs and the defendant's mobilehome.  Initially, after promising to check his source for narcotics, someone left Medina's home and drove to the defendant's home, and then arrived back at Medina's residence.  Medina then informed the officer he did not have a supply of drugs at that time.  Approximately two weeks later, immediately after arranging a sale of narcotics, Medina drove directly to the defendant's home, stopped briefly, and drove directly to the location of the narcotics transaction.

Noting the affidavit never stated anyone from Medina's vehicle actually entered the residence, the defendant argued the affidavit was lacking.  The *Romero* court disagreed, explaining "from all the surrounding circumstances, it is possible to draw the inference that some contact was made at the residence.  A vehicle does not ordinarily stop at a residence for short periods of time, on two occasions, so that the occupants of the vehicle can merely loiter.  But if this is the basis upon which probable case is lacking, it is a minor detail when the affidavit is construed as a whole."  (*Romero*, *supra*, 43 Cal.App.4th at p. 447.)  Thus the court concluded a well-trained officer reasonably could have relied on the warrant in good faith.  (*Ibid.*)

While we agree with the trial court and the dissent that the circumstances must be considered in context, we disagree as to the conclusions that can be drawn from them in this instance.  The circumstances recited in the affidavit certainly support the inference that Garibay-Muniz, Adan, and Reos went to a destination together.  The affidavit clearly supports the inference that Garibay-Muniz and Adan were engaged in narcotics

13.

trafficking and that they were having some sort of a meeting. The portions of the conversation overheard by the officer when there was a telephone call placed between Garibay-Muniz and Singh suggests a gang meeting was in fact taking place. The point at which we diverge from the trial court and our colleague is where the meeting was taking place. The only evidence in the warrant linking the meeting to defendant's home was the fact Reos's vehicle was seen "parked in front of" defendant's residence and that defendant was a "high-ranking 'Livas' Norteno street gang member."

Unlike the situation presented in *Romero*, the fact that no one was seen either entering or exiting the residence was not a "minor detail" omitted from the affidavit. The only connection to defendant's residence here was the fact that the car was "parked in front of" defendant's home while officers believed a gang meeting was taking place. This fact alone is insufficient to place the meeting within defendant's home. An attachment to the affidavit provided a picture of defendant's home. It appears to be a house on a residential street. Thus, the simple fact of a car "parked in front of" the house does not lead to the conclusion the occupants of the car entered that house, as opposed to any other nearby home. In contrast to *Romero*, officers here did not *follow* Reos's vehicle to a mobilehome. Nor had Reos been seen at defendant's home on *multiple occasions*. While the temporal proximity of the surrounding circumstances does indeed indicate a gang meeting was taking place, nothing demonstrates where the meeting was taking place.

This is not a situation where Reos was followed to defendant's home, observed remaining for a few minutes, and then departing. In *Romero*, it is fairly inferable—from the fact the officer followed the vehicle to the defendant's home and it remained for only a brief period of time and was subsequently followed from the home—that the officer indeed observed the connection between that particular home and Medina. In contrast, nothing in the affidavit here suggests Reos was observed either arriving or departing from defendant's home. Indeed the affidavit states Reos's vehicle was seen parked in front of defendant's home, suggesting it was not observed until the occupants departed. The

14.

affidavit states surveillance was at the home, where officers intercepted a telephone call. Almost an hour later Reos's vehicle was stopped at an intersection.

In *Romero*, one could infer from the fact the officers followed the vehicle to and from the defendant's residence, and the very brief nature of the stop, that some contact was made at the mobilehome. Here, the only fact in support of the meeting actually taking place inside defendant's home was the observation of the proximity of Reos's vehicle to the home. Unfortunately, nothing in the affidavit supports the inference that Garibay-Muniz entered defendant's home rather than any other home on the street. It does not appear the officers followed Reos's vehicle either to or from the residence. Thus, an inference the occupants were seen making contact with the residence, or that Reos or any other of the subjects being surveilled in this wide-reaching warrant had any contact with defendant whatsoever, is unsupportable.

Indeed, in stark contrast several other portions of the affidavit mention observing individuals entering or exiting homes of interest. In one instance, the affidavit recounts, along with other surrounding circumstances, an observation of a number of individuals entering Garibay-Muniz's residence to support the conclusion that a gang meeting was taking place there. On another occasion, officers observed Adan exit a specific residence and make what the officer believed to be a hand-to-hand transaction. Several other similar observations of individuals entering or exiting specific residences are made throughout the affidavit. These residences were also the subject of the search warrant. Thus, it appears Baker was well aware of the importance of creating a nexus between the homes and the suspected illegal activity.

But here the affidavit failed to establish any nexus between the criminal activity and defendant's residence requiring the conclusion that a well-trained officer could not have objectively believed the warrant was supported by probable cause. (*Hernandez*, *supra*, 30 Cal.App.4th at pp. 924-925.) As such, the good faith exception does not apply.

15.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to grant the motion to quash the warrant.

_____
                                                       PEÑA, J.

I CONCUR:


_____
GOMES, Acting P.J.

16.

**POOCHIGIAN, J., Dissenting.**

I share the majority's concerns about the sufficiency of the affidavit to set forth probable cause that defendant was a gang member, given the conclusionary statement about defendant's alleged gang status without supporting evidence. I also share the majority's concerns about the probable cause determination, based on the affidavit's failure to provide additional details about the presence of Reos's car outside defendant's house. However, though a close call, I believe it was reasonable for Officer Baker to rely on the facts expressed in his own affidavit and the court's issuance of the warrant to search defendant's house pursuant to the good faith exception stated in *United States v. Leon* (1984) 468 U.S. 897 (*Leon*).

*Leon* held "the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." (*Leon, supra*, 468 U.S. at p. 900.)

" '[A] warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' [Citation.]" (*Leon, supra*, 468 U.S. at p. 922.) In some circumstances, however, the officer will have no reasonable grounds for relying on the magistrate. (*Id.* at pp. 922–923.) The review in this regard will be "confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." (*Leon, supra,* 468 U.S. at p. 922, fn. 23.) The government has the burden of establishing "objectively reasonable" reliance. (*Id.* at p. 924.)

*Leon* described four limited situations in which such reliance would not be established, and in which suppression under the exclusionary rule would remain an appropriate remedy: (1) the issuing magistrate was misled by information that the officer knew or should have known was false; (2) the magistrate "wholly abandoned his judicial role"; (3) the affidavit was " 'so lacking in indicia of probable cause' " that it would be

" 'entirely unreasonable' " for an officer to believe such cause existed; and (4) the warrant was so facially deficient that the executing officer could not reasonably presume it to be valid. (*Leon, supra*, 468 U.S. at p. 923.)

The relevant inquiry under the third exception in *Leon* "is not whether further investigation would have been reasonable, but whether a reasonable officer … would have *known* that the affidavit, as it existed at the time it was to be presented to the magistrate, was legally insufficient without additional … corroboration." (*People v. Camarella* (1991) 54 Cal.3d 592, 606, original italics, fn. omitted (*Camarella*).) The question is whether "a well-trained officer should reasonably have *known* that the affidavit failed to establish probable cause (and hence that the officer should not have sought a warrant) …." (*Id.* at p. 596, original italics.) An officer applying for a warrant must exercise reasonable professional judgment and have a reasonable knowledge of what the law prohibits. (*Id.* at p. 604; *Leon, supra*, 468 U.S. at p. 920, fn. 20.) If the officer "reasonably could have believed that the affidavit presented a close or debatable question on the issue of probable cause," the seized evidence need not be suppressed. (*Camarella, supra*, 54 Cal.3d at p. 606.) The court must determine " 'on a case-by-case basis' whether the circumstances of an invalid search pursuant to a warrant require the exclusionary rule's application. [Citation.]" (*People v. Willis* (2002) 28 Cal.4th 22, 32.)

The majority opinion relies on *People v. Hernandez* (1994) 30 Cal.App.4th 919 (*Hernandez*), as to the absence of both probable cause to search defendant's house, and the absence of the *Leon* exception where the defendant's only connection to illegal activity was a car parked in front of his house. I believe the application of *Leon* in this case is closer to the situation in *People v. Romero* (1996) 43 Cal.App.4th 440 (*Romero*). In *Romero*, an undercover officer purchased drugs from Medina. In the first purchase, the officer called Medina, Medina said he would check his supply, and Medina left his house in a truck, drove to another location and then to defendant's mobile home. Medina returned to his own house – where the officer bought the drugs. A few days later, the officer again called Medina to purchase drugs, and Medina again said he needed to check

2

his supply. Medina left his house in the same truck, which was later seen parked in front of defendant's mobile home. Medina later met the officer at another location where the drug purchase was completed. The undercover officer obtained a search warrant for defendant's mobile home, and the trial court denied defendant's motion to suppress. (*Id.* at pp. 443–444.)

On appeal in *Romero*, the defendant relied on *Hernandez* and argued the presence of Medina's car in front of his mobile home was insufficient to establish probable cause to search his residence, and the search was similarly invalid under *Leon* for the reasons explained in *Hernandez.* (*Romero, supra,* 43 Cal.App.4th at p. 443.) *Romero* assumed that the affidavit failed to set forth probable cause, but concluded the search was valid under *Leon*:

> "This case contains more indicia of probable cause than *Hernandez.* Most significant here is the temporal sequence (lacking in *Hernandez*) between a drug dealer's promise to check his sources of drugs (or his statement of intention to sell drugs) and a visit to defendant's residence. Thus, here, on January 11, a drug dealer's emissaries visited defendant's residence shortly after the drug dealer said he would check his sources to see if drugs could be delivered. On January 30, within minutes of agreeing to sell drugs, the drug dealer stopped briefly at defendant's residence and then drove without interruption to consummate a drug sale. These facts permit the reasonable inference that defendant's residence was a source of supply for the drug dealer.

> "*Defendant makes much of the fact that the officers did not recount that the occupants of the pickup truck actually entered the residence. However, from all the surrounding circumstances, it is possible to draw the inference that some contact was made at the residence. A vehicle does not ordinarily stop at a residence for short periods of time, on two occasions, so that the occupants of the vehicle can merely loiter. But if this is the basis upon which probable cause is lacking, it is a minor detail when the affidavit is construed as a whole.* Examining the affidavit in its entirety, we conclude on these facts that a well-trained officer reasonably could have believed that the affidavit presented a close or debatable question on the issue of probable cause. [Citation.] Thus it cannot be said that [the undercover officer/affiant] should have known that his affidavit failed to establish probable cause (and hence that he should not have sought a warrant). [Citation.] [The officer's] subsequent reliance on the warrant that was issued was thus objectively reasonable under *Leon* and the trial

3

court properly denied defendant's motion to suppress on that basis. [Citation.]" (*Romero, supra*, 43 Cal.App.4th at p. 447, italics added.)

In this case, Officer Baker's 100-page affidavit in support of the search warrant for defendant's house was the result of more "than a mere 'bare bones' investigation" into a major drug transaction, and the facts stated in the entirety of the affidavit presented "a close or debatable question on the issue of probable cause" to connect defendant's house to that transaction. (*Camarella, supra*, 54 Cal.3d at p. 606.) The portion of Officer Baker's affidavit which focused on defendant's house was based on far more than a conclusionary statement about defendant's gang status or the presence of Reos's car in front of his house. (*Leon, supra*, 468 U.S. at p. 926.) Instead, the affidavit set forth extensive details that Garibay-Muniz, Adan Singh, and Augustine Singh were high-ranking gang associates who were arranging a large narcotics transaction, and the drugs would be dispersed to street level dealers.

More importantly as to the application of *Leon* to defendant's involvement, Officer Baker's affidavit contained facts in support of his belief that Garibay-Muniz conducted a meeting at defendant's house about the drug transaction: the phone calls where Garibay-Muniz and Singh discussed the need to have a meeting; Singh's arrangement for "David" to pick up Garibay-Muniz outside his apartment; the cell phone "ping" which, as the superior court later explained, occurred in a location toward defendant's house; the presence of David Reos's car parked at defendant's house at about the same time; the surveillance outside defendant's house, during which agents intercepted the cell phone call from Garibay-Muniz to either Adan or Augustine Singh, where a male voice apparently conducted a gang meeting about the drug transaction; and the subsequent presence of Garibay-Muniz and Adan Singh in Reos's car, albeit at another location.

The superior court denied defendant's suppression motion and found the warrant was supported by probable cause; it did not consider whether *Leon* applied to this case. Nevertheless, the superior court stressed that it had to examine the entirety of the

4

affidavit in context, rather than individual facts in isolation.  In doing so, the court cited the same circumstantial evidence to link defendant's house to Garibay-Muniz, his associates, and the meeting about the drug transaction which was intercepted while the officers maintained surveillance on defendant's house and Reos's car was parked in front.

Officer Baker's assertion about defendant's gang status may have been conclusionary for probable cause purposes, and the officers did not see anyone walk between defendant's house and Reos's car.  As in *Romero*, however, I believe the entirety of the factual circumstances described in the affidavit raised a question for any objectively reasonable and well-trained officer as to the presence of Garibay-Muniz and his associates at defendant's house as they conducted a meeting about the gang-related drug transaction.  (*Leon, supra*, 468 U.S. at p. 926; *Camarella, supra*, 54 Cal.3d at p. 606.)  Officer Baker's lengthy affidavit was not so deficient as to render his reliance on the court's finding of probable cause to search defendant's house objectively unreasonable.

_____

Poochigian, J.